1                       UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF KENTUCKY
2                          LOUISVILLE DIVISION

3
    UNITED STATES OF AMERICA,      )      Case No. 3:09-CR-00148-CRS
4                                  )
            Plaintiff,             )
5                                  )
        VS.                        )
6                                  )
    REGINALD GREEN,                )
7                                  )      November 20, 2012
            Defendant.            )       Louisville, Kentucky
8

9                              * * * * *

10                     TRANSCRIPT OF SENTENCING
              BEFORE HONORABLE CHARLES R. SIMPSON, III
11                   UNITED STATES DISTRICT JUDGE

12                             * * * * *

13   APPEARANCES:

14   For United States:      Marisa J. Ford
                             U.S. Attorney's Office
15                           717 West Broadway
                             Louisville, KY 40202
16
     For Defendant:          Daniel M. Alvarez
17                           Daniel M. Alvarez, PLLC
                             539 West Market St., Suite 300
18                           Louisville, KY 40202

19
     [Defendant present.]
20

21
                         Dena Legg, RDR, CRR, CCR-KY
22                         Official Court Reporter
                           232 U.S. Courthouse
23                         Louisville, KY 40202
                             (502) 625-3778
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

1        (Begin proceedings in open court at 1:53 p.m.)

2              THE COURT:  This is *U.S. v. Green.*  Is that --

3              MS. FORD:  Yes, sir.

4              THE COURT:  Is that not right here?

5              MR. ALVAREZ:  Correct, Your Honor.

6              MS. FORD:  Yes, sir.

7              THE COURT:  Okay.  And this is to sentence Mr. Green.

8              MS. FORD:  That's correct, Your Honor.

9              THE COURT:  Okay.  Would you-all note your appearances

10   on the record here.

11             MS. FORD:  Marisa Ford for the United States, Your

12   Honor.

13             MR. ALVAREZ:  Daniel Alvarez for Mr. Green.  I am CJA

14   appointed and he is standing to my left.

15             THE COURT:  Okay.  Thank you.

16       We've had a presentence report prepared and disclosed.  Have

17   you reviewed this for the Government, Ms. Ford?

18             MS. FORD:  I have, Your Honor.  I've reviewed it and

19   the United States had no objections to the presentence report as

20   prepared.

21             THE COURT:  All right.  Mr. Alvarez, have you reviewed

22   this presentence report --

23             MR. ALVAREZ:  I have, Your Honor.

24             THE COURT:  -- in consultation with your client?

25             MR. ALVAREZ:  And we have, Judge.

1          THE COURT:  And were there any objections or

2    corrections that need to be made?

3          MR. ALVAREZ:  Judge, there were certain objections

4    that my client wanted me to make.  However, discussing the

5    situation with him currently and after conference with Ms. Ford,

6    we've come to a stipulation as to the amount of loss and,

7    therefore, we don't have any further objections.  We'd like to

8    withdraw those that were made.  We would like to make arguments

9    for variance, however.

10          THE COURT:  Okay.  Well, let's see where we are on

11    this.  The presentence report, I think, indicated the defendant

12    should be held accountable for a loss of $285,299.49.  Is there

13    some change to that?

14          MS. FORD:  Yes, sir.  If I can explain that.  Judge,

15    in our plea agreement, we agreed to a floor of loss of -- the

16    loss was not less than $120,000.  And in the stipulated factual

17    basis on page two of the plea agreement, the court will see that

18    the parties agreed that we had evidence of 64 specific

19    attempts -- 64 specific instances in which checks were either

20    actually negotiated or presented for negotiation.  And those are

21    identified in the chart that's set forth on pages seven through

22    ten of the presentence report.

23      The total amount of those checks was just in excess of

24    $167,000.  And in addition, a check was found on Mr. Green's

25    person, I believe at the time of his arrest, in the amount of

1    $5,166.71.

2        The additional amount of loss in the presentence report is

3    based primarily on estimates or statements of co-conspirators of

4    Mr. Green's.  For purposes of Mr. Green's sentencing, Your

5    Honor, the United States agrees that the chart that's set forth

6    in the presentence report, plus the check found on his person,

7    is the best calculation of loss or intended loss for this

8    defendant and that would be $172,599.19.

9            THE COURT:  170 --

10           MS. FORD:  $172,599.19.  That would change paragraph

11   57 of the presentence report so that, I think, ten points would

12   be added for the amount of loss, as opposed to 12.

13           THE COURT:  All right.  And the defendant agrees with

14   that, Mr. Alvarez?

15           MR. ALVAREZ:  Yes, Your Honor.

16           THE COURT:  Okay.  So --

17           MS. FORD:  That would bring our total offense level,

18   Your Honor, to 18.

19           THE COURT:  Yeah, two less than what's in the current

20   latest and greatest presentence report.

21           MS. FORD:  Yes, sir.

22           THE COURT:  Okay.  So --

23           MS. FORD:  I think the parties have agreed, Judge,

24   that all of the other enhancements set forth in the presentence

25   report do apply, those being possession of identification

1    documents and role in the offense.

2            THE COURT:  Okay.  So we're at an 18 and I on the

3    guideline grid as 27 to 33 months.

4            MS. FORD:  That's correct.

5            THE COURT:  6,000 to $1 million in fines and a term of

6    supervised release of one to three years.

7            MR. ALVAREZ:  That's correct, Your Honor.

8            THE COURT:  All right.  So you have -- is that the

9    sentence that the Government is recommending here?

10           MS. FORD:  Your Honor, pursuant to the plea agreement,

11   the United States is recommending a sentence at the low end of

12   the guideline range.  So we would recommend a sentence of 27

13   months in prison.

14           THE COURT:  All right.  Mr. Alvarez, you said you want

15   to address an argument for a variance in this.

16           MR. ALVAREZ:  Yes, Your Honor.  And I would like to

17   just call one quick witness, if the court would allow me.  It's

18   in regards to this argument for variance.

19           THE COURT:  Okay.

20           MR. ALVAREZ:  Thank you, Judge.  I would like to call

21   Tasha McKinley.

22           COURT SECURITY OFFICER:  Is she here?

23           MR. ALVAREZ:  She is.  She's present.

24      (TASHA MCKINLEY, called by the defendant, sworn.)

25           THE COURT:  Now, you had some issues that you had

McKinley - Direct

```
 1    raised in some emails, but that's all been resolved?
 2              MR. ALVAREZ:  Yes, Your Honor.
 3                       DIRECT EXAMINATION
 4    BY MR. ALVAREZ:
 5    Q.  Would you go ahead and introduce yourself to the court,
 6    please.
 7    A.  My name is Tasha McKinley.
 8    Q.  Tasha, how do you -- well, first of all, good afternoon.
 9    Thank you for being here today.
10    A.  Good afternoon.
11    Q.  How do you know Reggie?
12    A.  Reginald is my boyfriend.
13    Q.  Okay.  And how long have you known him?
14    A.  Four years.
15    Q.  Okay.  And just tell us about what's going on with your
16    current situation right now.
17    A.  Currently we're residing in Lawrenceville, New Jersey with
18    Reginald's sister.
19              THE COURT:  Can you speak a little louder.  I'm having
20    trouble hearing you.  Thank you.
21    A.  Currently we're residing in Lawrenceville, New Jersey with
22    his sister, Cynthia Gibson, and his brother-in-law, Troy Gibson,
23    and our -- well, his daughter.  Her name is Treasure Thomas.
24    Q.  Okay.  And I'm just going to fast-forward here and get to
25    the point.  Miss Thomas -- Miss Treasure Thomas is Reggie's
```

McKinley - Direct

1   biological child; correct?

2   A.  Correct.

3   Q.  She's currently living with Reggie?

4   A.  Correct.

5   Q.  Okay.  And he has custody of her, correct, temporary custody

6   of her?

7   A.  Correct, uh-huh.

8   Q.  Okay.  And he was granted that -- and I'll give the court

9   some documentation as far as that's concerned -- back in -- when

10  was he granted the temporary custody?  Was that back in January

11  of last -- of 2012?  No, it was this year; correct?

12  A.  It was this year, yes.

13  Q.  If you could just kind of explain what role Reggie's had in

14  her life since -- since he's been -- first, how did the child

15  come into his custody and what's happened since?

16  A.  Okay.  When she had came to us, her mom had dropped her off

17  with the intentions of her picking her back up.  Well, that

18  never happened.  The child had suffered post traumatic stress

19  disorder and abandonment issues.

20      She has received extensive hospitalization because of that

21  to help her with her behavior issues and her emotional issues.

22  She had spent over a month-and-a-half hospitalized probably no

23  more than two to three weeks after she came to reside with us.

24  And then probably -- let's see, I'm thinking that it's around

25  March -- she had spent another six months being hospitalized at

McKinley - Direct

1    Our Lady of Peace for children to help her with her coping

2    skills and to learn to -- learn how to behave and learn how to

3    adjust to being around a normal environment, which she was not

4    able to do at the time when she came to us at all.  She's much

5    better now.

6    Q.  Okay.  And tell us about where she -- first of all, how old

7    is she?

8    A.  Now she's 10.  She's 10 years old.  She just turned 10

9    August the 28th.

10   Q.  And is she going to school?

11   A.  Yes.  She's attending Lawrenceville Intermediate School in

12   Lawrenceville, New Jersey.

13   Q.  How are her grades?

14   A.  She's making straight As now.  Her behavior has improved

15   significantly.

16   Q.  Okay.  And how has Reggie -- how have you seen Reggie with

17   her?  How do they -- do they get along?

18   A.  Oh, yes.

19   Q.  Provide --

20   A.  She highly respects him.  When she came to us, she could

21   not -- she couldn't cope well with authority at all from any

22   adult or any authority figure.  She loves her father.  She

23   respects him.  She does what's asked of her and she knows how to

24   be a child now.  At one point in time she didn't know how to be

25   a child.

McKinley - Cross

```
 1              MR. ALVAREZ:  Okay.  Those are all the questions I
 2    have.  Thank you.
 3              MS. FORD:  I just have a couple of questions, Your
 4    Honor.
 5                        CROSS-EXAMINATION
 6    BY MS. FORD:
 7    Q.  Ms. McKinley, when was it that Treasure Thomas came to live
 8    with you and Mr. Green?
 9    A.  It was August the 28th of --
10    Q.  Of 2011?
11    A.  2011, yes.
12    Q.  Okay.
13    A.  I think it was 28th.
14              THE COURT:  I think it was this year.
15    A.  22nd.
16              MS. FORD:  I'm sorry, Judge?
17              THE COURT:  It was 2012, I believe.
18    A.  No.  It was --
19              MS. FORD:  That's why I'm -- I'm a little confused.
20    A.  It was 2011.  It was August 22nd of 2011.
21    Q.  Am I correct that temporary custody was granted by the court
22    in January of --
23    A.  That was this year.
24    Q.  -- this year, January 2012?
25    A.  I believe that the case had started in January, right, and
```

1    then it was closed.  I think he was granted custody in April.

2    Q.  So there was a period of several months when the child had

3    been left with you -- or with Mr. Green by her mother and she

4    just didn't pick her up?

5    A.  Exactly.

6    Q.  So the actual status of custody was not clear?

7    A.  Exactly and it had to be obtained, yes.

8    Q.  Were you-all living down here in Louisville at that time?

9    A.  Yes, we were, yes.

10   Q.  Are you from this area?

11   A.  Yes.

12   Q.  Okay.  You probably understand from talking to your

13   boyfriend that he most likely will be going to prison for some

14   period of time.

15   A.  Yes, yes.

16   Q.  What have you-all talked about -- what are the plans for

17   Treasure while -- for whatever period he's incarcerated?

18   A.  Well, while he's incarcerated, his sister and I will care

19   for her.

20   Q.  Okay.  Do you work?

21   A.  Yes.  I'm a nurse.

22   Q.  Okay.  And what about his sister?

23   A.  Yes, she works in Princeton, I believe it is.  She works in

24   the medical field.  She's an administrative clerk.

25   Q.  Okay.  But there -- and so there's no foreseeable change in

McKinley - Cross

```
 1    terms of where Treasure will be living or who will be caring for
 2    her?  I mean, she will have care?
 3    A.  Yes.  She needs constant -- I mean, she needs structure.
 4    She has to have structure.  She can't, you know, bounce from
 5    here to there.  That's not good for her, especially with her
 6    diagnosis and everything that she's been through and the
 7    hurdles.  But she's achieved so much, she doesn't need to
 8    regress.
 9    Q.  Okay.  And you'll plan -- are you planning to stay in
10    New Jersey?
11    A.  Yes.
12            MS. FORD:  Okay.  That's all I have, Your Honor.
13            THE COURT:  Anything further?
14            MR. ALVAREZ:  No, Your Honor.
15            THE COURT:  You may step down.  Thank you.
16            THE WITNESS:  Thank you.
17            THE COURT:  Anything else, Mr. Alvarez?
18            MR. ALVAREZ:  No, Judge.  I'd just like to make
19    argument now for variance.
20            THE COURT:  Mr. Green, you reviewed the presentence
21    report in consultation with your attorney?
22            THE DEFENDANT:  Yes, I did, Your Honor.
23            THE COURT:  Were there any other mistakes or errors or
24    problems in this presentence report that you wish to bring to my
25    attention?
```

```
1              THE DEFENDANT:  No, sir, Your Honor.
2              THE COURT:  All right.  Mr. Alvarez, what do you have
3   to say?
4              MR. ALVAREZ:  Yes, Judge.  Pursuant to 18 U.S.
5   3553(a), I would like the court to consider a variance in this
6   case of -- a one-level variance to get us down to a level 17 and
7   ask the court for a 24-month sentence.
8         As the court heard, you know, Reginald has -- Reggie has
9   played a really integral part in the care, love, and help both
10  mentally for his child as well as financially.
11             THE COURT:  Which one are we talking about?
12             MR. ALVAREZ:  Which is Treasure Thomas.
13             THE COURT:  Okay.  Because he has --
14             MR. ALVAREZ:  Correct.
15             THE COURT:  -- it looks like about a dozen children in
16  various stages of growing up from very small to older.
17             MR. ALVAREZ:  That's correct.  He has a total of 12
18  children, seven of which are under the age of 18.  The rest are
19  all adults.
20        But particularly with Treasure, she has obviously suffered
21  mentally from her mother essentially, you know, dropped her off
22  and abandoned her with Reggie.  And as a result, she's gone
23  through some extensive mental health treatment and -- but all
24  along the way --
25             THE COURT:  From not having a relationship with her
```

1    mother, is that what you think?

2          MR. ALVAREZ:  Well, there's -- and I do have other

3    issues and I have other documentation regarding the situation,

4    but it's an overall -- she's suffered grave and emotional abuse

5    and witnessed domestic violence, witnessed not with -- in the

6    home of the mother when she's been away from Mr. Green, but she

7    would continue to obviously suffer the lack of her parent now,

8    Reggie, from being there with her.

9        Obviously, Your Honor, and Reggie knows that he has to serve

10   his time.  Reggie understands that he has committed a crime.  He

11   understands and acknowledges that he does have to serve a

12   sentence in this matter, but I would also like the court to take

13   into account that this is a case that's been ongoing since 2009,

14   that Mr. Green has not had any violations during that time

15   period, save for an arrest on a child support issue, which he

16   did take care of.  He has had no criminal -- and that was a

17   civil -- that was out of a civil court.

18       He has had no criminal history since 1992.  He in fact has

19   criminal history points of zero and criminal category I.  And he

20   is essentially fighting for his daughter, and we are just asking

21   the court to consider this three-month difference in a one level

22   variance given that situation.

23       And this is something that, obviously, would fall under the

24   factors of 3553(a), which of course are the nature and

25   circumstances of the offense, which the subsection one states,

1    "nature and circumstances of the offense and history and

2    characteristics of the defendant."  We do believe that this

3    would fall under that and ask the court for a variance of one

4    level and three-month reduction in the sentence.

5            THE COURT:  He's got a whole bunch of children that

6    are younger and older; right?

7            MR. ALVAREZ:  That's correct.

8            THE COURT:  Some of which he sees and some of which he

9    doesn't see.  He has one with cerebral palsy, one with ADHD.  He

10   is having a problem with supporting these children.

11           MR. ALVAREZ:  Three of the children are with the

12   co-defendant, and he is not -- he's been not allowed to have any

13   contact with her and as a result with the children as well.

14           THE COURT:  That's the Harrison --

15           MR. ALVAREZ:  Yes.

16           THE COURT:  -- bunch, but he has also got one with

17   Cassell.

18           MR. ALVAREZ:  Yes.

19           THE COURT:  Who's age three.

20           MR. ALVAREZ:  Correct.

21           THE COURT:  And there's been a little problem there

22   with child support.  He's got some with other people in

23   New Jersey.  Well, it does appear that Mr. Green has been active

24   in his prior life in a family sort of way.

25       What do you have to say about this, Ms. Ford?

1          MS. FORD:  Well, Judge, the variance that -- at least

2    in my experience, the variance that the defendant is asking for

3    here is a relatively modest one.  Typically I would expect to

4    hear a defendant arguing for probation, and he's not doing that.

5        The United States is not unsympathetic to the situation of

6    this particular child, although as the court points out, it

7    appears that Mr. Green has other offspring who also have some

8    medical issues, and it does not necessarily appear that they're

9    getting the same kind of attention that this child Treasure

10   Thomas is.  It appears to be --

11         THE COURT:  Well, then again, they have mothers

12   apparently.

13         MS. FORD:  That is correct.  And, Judge, in this case

14   5H1.6 of the guidelines says that family ties and the

15   responsibilities are not ordinarily grounds for a departure from

16   the guidelines.

17       In this case, while the other children have mothers, this

18   particular child, fortunately it appears, has Ms. McKinley and

19   Mr. Green's sister, who both work in the medical field and are

20   prepared to continue to provide a stable home environment for

21   this child for whatever period of time he is incarcerated.

22       But whether or not there should be a variance of the three

23   months that the defendant is asking for, whether the defendant

24   has satisfied the court that that's warranted under these

25   circumstances, obviously, is left to the discretion of the

1    court.

2        I will note, Judge, that I think Mr. Green is looking for

3    employment so this -- this family unit will not be deprived of

4    his income for the period that he's incarcerated and it does

5    appear that the child now is getting medical attention and

6    treatment and is in a stable environment.

7            THE COURT:  You said he's looking for employment?

8    That's what the presentence report said.

9            MS. FORD:  That's correct.  I don't think he -- he was

10   employed at one period while this case has been pending, but I

11   don't think he's currently employed.

12           THE COURT:  I don't know how to -- I mean, why would

13   somebody be looking for employment when they're about to go into

14   jail for a couple of years?  What do you make of that?  How am I

15   supposed to think about that?

16           MS. FORD:  Well, I don't know if a condition of his

17   bond has been that he look for employment.  That frequently is a

18   condition of bond, that even though a defendant may be going to

19   prison, that they at least try --

20           THE COURT:  He's getting at the end of the rope here.

21   That's usually at the beginning, not at the end.

22           MS. FORD:  This has been a fairly long rope, Your

23   Honor.

24           THE COURT:  I mean, these -- this is an '09 case.

25           MS. FORD:  That's correct.

```
 1              THE COURT:  Why is it still around here?

 2              MS. FORD:  That's a good question.

 3              THE COURT:  Maybe Mr. Alvarez has the answer to that.

 4   I don't know.

 5              MR. ALVAREZ:  No, sir.

 6              THE COURT:  It's not customary --

 7              MS. FORD:  No, it is not.

 8              THE COURT:  -- to be sentencing somebody in 2012 for a

 9   2009 case with --

10              MS. FORD:  That's correct.

11              THE COURT:  -- with activity that --

12              MS. FORD:  Occurred --

13              THE COURT:  -- goes way back.

14              MS. FORD:  That's correct.

15              THE COURT:  Okay.  Anything else?

16              MR. ALVAREZ:  No, Your Honor.

17              THE COURT:  Mr. Green, is there anything you want to

18   say regarding this matter?  You don't have any obligation to

19   speak, but if you wish to, you can.

20              THE DEFENDANT:  Your Honor, this has been a very life-

21   changing experience for me, you know, the past three years.  The

22   case actually started five years ago, was in state court and it

23   was thrown out, and then I was federally indicted in 2009.  And,

24   basically, it changed my whole entire life, my whole entire

25   thought process and the way I should live.
```

1       I'm 43 years old.  For three years of my life I've done
2   everything that I'm supposed to do correctly.  The first 40
3   years of my life I was in the wilderness but the change has came
4   in my life.  I've accepted the change.  I've accepted the
5   responsibility for what I've done, and I just want to move
6   forward, you know.

7       I have to walk through this.  I mean, it's like I know where
8   I came from.  I know where I'm going now, but it's the middle
9   part that just have to be straightened out.  I'm just in the
10  middle of something.  And that's why I'm here today, to just
11  accept responsibility for what I've done and go on with my life,
12  you know.  It's changed.  My life has changed.

13      I've been drug free for three years.  I was a chronic
14  marijuana smoker.  I don't even smoke weed no more.  I don't
15  even crave marijuana no more.  And, again, I've cooperated
16  throughout this whole case, no trouble.

17      I got to help my daughter for 15 months.  She came to me
18  August 22nd of last year and I changed her.  It's the old
19  saying -- I mean, I have 12 sheep.  One is lost.  Which one is
20  more important?  The one that's lost and that's the one that I
21  helped, and I feel good about that.

22      I had to break this to my daughter just two weeks ago.  I
23  took her to the market in New Jersey, and I broke this to her
24  like, "When you do bad things, you have to pay consequences."
25  So my message to Treasure is "Stay in school.  Keep reading.  Go

1    to college so you won't have to be going through what daddy's

2    going through," you know, but we'll be back again.  This is -- I

3    mean, my best days are ahead of me, you know, and that's all I

4    have to say, Your Honor.  Thank you very much.

5            THE COURT:  All right.  Well, as the prosecutor

6    pointed out, family circumstances are not ordinarily a basis for

7    departure.  Perhaps this situation is a little different due to

8    the lack of any direct family, except the defendant, to take

9    care of her, although they've made arrangements for her to be

10   cared for while he's doing his time.

11       The variance request is modest so I'll grant it and depart

12   down one level.  So we'll indicate that we've considered the

13   advisory guidelines and the 3553(a) factors, which have been

14   pointed out.  I think this is a variance based on what has been

15   stated with respect to the daughter.  I don't think it fits

16   squarely within 3553(a) because it really doesn't have anything

17   to do with this offense or even the defendant's characteristics,

18   but the guideline appears to have some leeway under unusual

19   circumstances.  And the PTSD and the fact that they're -- the

20   mother has abandoned the child apparently seems to be enough to

21   allow for the variance that's been requested here.

22       So we'll commit the defendant to the custody of the bureau

23   of prisons for a term of 24 months as to Counts 1 and 6 and

24   order those served concurrently, for a total of 24 months

25   imprisonment.

1     Upon release, we'll place the defendant on supervised

2    release for a term of three years as to each of Counts 1 and 6,

3    order those run concurrently for three years of supervised

4    release.

5        If he, you know, comports himself appropriately, he may ask

6    for early termination, but given his vast history of fraud here,

7    I want to make sure that we have plenty of time to make sure

8    that he doesn't become a recidivist.

9        We'll order that he abide by standard conditions adopted by

10    the court.  I'm not sure why we need financial restrictions on

11    this.  He's got a significant amount of restitution and it

12    doesn't look like there's a snowball's chance in Louisville that

13    he's going to be able to pay much of that.  Is that the reason

14    for it?  So he doesn't go out and --

15            PROBATION OFFICER:  So we can do credit checks and

16    monitor the way he's spending his money to make sure he's paying

17    his restitution.

18            THE COURT:  Is that what you need on that?

19            PROBATION OFFICER:  That's usually --

20            THE COURT:  We'll order that then, just so that they

21    can keep tabs on it.  So the financial restrictions will be in

22    addition to the standard conditions.

23        We'll further order the payment of restitution.  The figure

24    I have here is 151,296.40.  Is that the -- is that the correct

25    amount, counsel?  $151,296.40 or is it 172,599 --

1          MS. FORD:  It's not 172, Judge.  I thought it was

2     $145,305.58.  That's what is in paragraph 49 of the presentence

3     report.

4        That last check, if the -- the last check was found on his

5     person so that wouldn't be added in there.  So I think the

6     $145,305.58, Judge, represents the dollar amount of the checks

7     that were actually negotiated.

8          THE COURT:  Give me that amount now so Mr. Alvarez can

9     write it down.  It's 145 --

10          MS. FORD:  $145,305.58.

11          THE COURT:  305.58?

12          MS. FORD:  Yes, sir.

13          THE COURT:  All right.  Is that correct?

14          MR. ALVAREZ:  That is correct, Your Honor.

15          THE COURT:  All right.  Then we'll order the payment

16     of restitution in that amount, 145,305.58.

17        Also, we'll order the payment of a special penalty

18     assessment of $100 as to each count for a total of $200, order

19     the sanctions of restitution and the special penalty assessment

20     paid in accordance with the schedule of payments page contained

21     in the judgment.  We'll waive the imposition of a fine and the

22     costs here of investigation and prosecution, incarceration,

23     supervision due to inability to pay.

24        We were at an 18 and I on the guideline grid here, and we

25     departed downward one level for the reasons previously stated to

```
1    17 and I and imposed the sentence at the lowest end of that
2    level, which is 24 months, no fine, and a term of supervised
3    release of three years and find that that is within the -- and
4    also the payment of restitution and the special penalty
5    assessments.  That's within the adjusted advisory guideline
6    range and is sufficient but not greater than necessary to comply
7    with the statute.  The Mandatory Victim's Restitution Act
8    applies so -- because fraud is involved here so restitution is
9    required.
10       Are there any objections we haven't heard to this, Ms. Ford?
11            MS. FORD:  No, sir.  Thank you, Your Honor.
12            THE COURT:  Mr. Alvarez, anything further?
13            MR. ALVAREZ:  No --
14            THE COURT:  Let me get on with this then.  We'll
15   impose that sentence.
16       Did Mr. Green waive his appeal rights in the plea agreement?
17            MS. FORD:  He did, Your Honor.
18            MR. ALVAREZ:  Yes, Your Honor.
19            THE COURT:  So I don't need to advise him of that.
20       Is there anything further from the Government?
21            MS. FORD:  No, sir.
22            THE COURT:  Mr. Alvarez?
23            MR. ALVAREZ:  Judge, there's two things.  One is self-
24   reporting.  We're going to ask Your Honor to allow Mr. Green to
25   self-report.
```

```
1               THE COURT:  All right.  Is he a candidate for

2    voluntary surrender?

3               PROBATION OFFICER:  Yes, sir.

4               THE COURT:  Is there any objection by the Government?

5               MS. FORD:  No objection, Your Honor.

6               THE COURT:  All right.  We'll order that Mr. Green

7    report to the institution designated by the bureau of prisons to

8    commence service of this sentence by no later than 2:00 p.m. on

9    the date indicated.  And I'll permit him to remain under the

10   terms of his present bond pending his reporting as required.

11      Mr. Green, if you cannot find your way to whatever

12   institution is designated, you can come into this building and

13   surrender to the marshal's office here, but you must do so by

14   2:00 p.m. on the date indicated or you could be considered to be

15   in escape status.  Do you understand that?

16              THE DEFENDANT:  Yes, sir.

17              THE COURT:  All right.  Are you living here or in

18   New Jersey?

19              THE DEFENDANT:  Yes, sir, I live in New Jersey, sir.

20              THE COURT:  Well, then you would need to go to the

21   marshal's -- the closest marshal's office in --

22              THE DEFENDANT:  It's in Trenton, New Jersey.

23              THE COURT:  Trenton or Newark -- I don't know where --

24   but any large city is going to have a marshal's office.

25      So we've covered that.  Mr. Alvarez, anything further?
```

1    MR. ALVAREZ:  The last thing was recommendation of a

2 facility.  Mr. Green wanted to have a recommendation for a camp.

3 According to him, there's an FCI or a federal bureau of

4 corrections in New Jersey in Fairton, New Jersey, F-A-I-R-T-O-N,

5 New Jersey, which has a camp, and he's just asked me to ask the

6 court for a recommendation.

7    THE COURT:  Okay.  I see no problem with that,

8 although ultimately the bureau of prisons is going to make that

9 decision.  But his legal address is in Lawrence, so I suppose

10 they would designate an institution close to there.  But you

11 want me to specify Fairton, F-A-I-R-T-O-N?

12    MR. ALVAREZ:  Yes, Your Honor.

13    THE COURT:  New Jersey.  A camp there?

14    MR. ALVAREZ:  Yes, Your Honor.

15    THE COURT:  All right.  He may well qualify for a

16 camp.  I'm not sure, but he may well qualify for one.  He's been

17 on bond all this time and so if he's getting-self surrender and

18 a 24-month sentence, he may well qualify for a camp so we'll

19 designate Fairton and see what happens.

20    MR. ALVAREZ:  Thank you, Your Honor.

21    DEPUTY CLERK:  Excuse me, Judge.

22    THE COURT:  Is there anything further we need to --

23    MS. FORD:  Judge, pursuant to the plea agreement, the

24 United States moves to dismiss Counts 2, 3, and 4 as to this

25 defendant only.

```
 1              THE COURT:  Okay.  Those are the aggravated identity
 2    theft?
 3              MS. FORD:  Yes, sir.
 4              THE COURT:  What about Count 5?  Is that --
 5              MS. FORD:  I don't believe he was charged in Count 5.
 6              THE COURT:  He's not in Count 5?
 7              DEPUTY CLERK:  I have it.  I have it in Count 5.
 8              MS. FORD:  Let me look at the indictment again.
 9              THE COURT:  Mr. Alvarez, do you recall whether --
10              MS. FORD:  No, the only defendant that's charged in
11    Count 5 was Rhonda Lynn Willis.
12              THE COURT:  All right.  So we'll dismiss Counts --
13              MS. FORD:  He was charged in 2, 3, and 4.
14              THE COURT:  -- 2, 3, and 4 without prejudice without
15    objection.
16              MR. ALVAREZ:  Without objection.
17              THE COURT:  All right.  Counsel, thank you.
18              MS. FORD:  Thank you, Judge.
19              MR. ALVAREZ:  Thank you, Your Honor.
20              THE DEFENDANT:  Thank you.
21         (Proceedings concluded at 2:30 p.m.)
22
23
24
25
```

1              C E R T I F I C A T E

2        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5
          s/Dena Legg                    June 29, 2015
6    Certified Court Reporter No. 20042A157      Date
     Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2    DEFENSE WITNESS:

 3    TASHA MCKINLEY
           Direct Examination by Mr. Alvarez          6
 4         Cross-Examination by Ms. Ford              9

 5

 6                            EXHIBITS

 7    No Exhibits

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```